### STATE v. BELTON.

1. A boy of twelve years who could repeat the Lord's prayer, and had heard that the bad man caught those who lied, cursed, &c., but had never heard of a God, or the devil, or of heaven or hell, or of the Bible, and had never heard, and had no idea, what became of the good or of the bad after death, is not a competent witness. Mr. Justice McGowan, *dissenting.*

2. Declarations made by the deceased a few hours before his death, charging the prisoner with the infliction of the mortal wound, are admissible in evidence, his crying out at the time, "O Lord, I cannot stay here much longer," indicating that he had lost all hope of recovery, and looked for an immediate dissolution.

3. A dying declaration of the deceased, that the accused had passed him on the afternoon of the homicide on the road, was admissible in evidence.

4. A threat of the accused against "the Deans," without excepting any of the name, was admissible in evidence against him, the deceased being of that name and family, notwithstanding the proof showed the prisoner's quarrel had been wholly with other members of the family.

Before Hudson, J., Kershaw, September, 1885.

The opinion sufficiently states the case.

*Mr. W. D. Trantham,* for appellant, *cited Best Evid.*, 62, 228; 1 *Strob.*, 160; 1 *Green. Evid.*, 368–9; 1 *Sm. Lead. Cas.*, 196; 9 *Smedes & M.*, 120; 55 *Cal.*, 72; 24 *Id.*, 24; 9 *Car. & P.*, 418; 11 *Cox Cr. Cas.*, 250; 3 *Car. & P.*, 631; 2 *Parker Cr.*

*Rep.*, 236; *Whart. Hom.*, 750; *Whart. Cr. Evid.*, 264, 278; 2 *Jones*, 360; 65 *Mo.*, 325.

*Mr. J. D. Kennedy*, contra.

February 16, 1886. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. The defendant, David Belton, was convicted of the murder of Aaron Dean at the September term, 1885, of the Court of General Sessions for Kershaw County, his honor, Judge Hudson, presiding. From the judgment, he has appealed upon four exceptions, raising questions as to the competency and admissibility of certain testimony introduced by the prosecution. The first is as to the competency of a witness, Jim Miller. This witness was a boy about twelve years of age. He seems to have been a boy of, at least, ordinary intelligence, and although he had learned from his mother, since dead, the Lord's prayer, when he was five years old, and, according to his statement, had repeated it every day since, yet he said he had never heard of a God or the devil, or of heaven or hell, or of the Bible, and that "he had never heard, and had no idea, what became of the good or of the bad after death." He said, however, that he had heard it said that the bad man caught those who lied, cursed, &c., and upon being examined, he repeated the Lord's prayer. The presiding judge, in his report of the case as to this matter, states as follows: "As for the colored youth, he manifested an unusual sense of the efficacy of prayer, and the future torments by the bad man awaiting those who speak falsely, though his answers as to a God, heaven, &c., were singular. The court gave him instructions as to the meaning and obligation of an oath, and then permitted him to be sworn." His admission is assigned as error in the first exception.

The declarations of the deceased, made a short time before his death, as to who fired the fatal shot, and stating that the defendant had passed them on the road some three miles from the place where he was shot, were admitted as dying declarations. This is excepted to in the second and third exceptions (1st), because the evidence did not show that the deceased had given up all hope of life, and (2d), as to the statement of his having been passed by

the accused on the road, that this could not be allowed under the law of dying declarations.

The fourth exception alleges error, in that one Everett Kirkland was permitted to testify that he had heard the defendant say "that if those Deans did not stay off his lands and let him alone, he would put a load of shot into some of them ; that he had carried them before a trial justice, had posted his land, &c.," the appellant claiming this to be error, because that while it was true that the father and brother of the deceased had been in difficulties with the accused on account of trespass upon his land, yet that the deceased was in no way involved, he being a young man, absent from the place most of the time, and on friendly terms with the accused.

Now, let us recur to the first exception. A leading case upon the question of law raised therein in England is the case of *Omichund* v. *Barker*, reported in 1 *Willes*, 538, and more fully in 1 *Atk.*, 21, and found in 1 *Smith Lead. Cas.*, 195. In this case, upon a full and most interesting discussion of the whole question of the competency of a witness as affected by his religious creed, it was made to rest upon the question of his belief in the existence of a God, and rewards and punishments by him, either in this world or in the future state, "the court stating that one who believes a future state, and that he shall be punished in the next world as well as in this if he does not swear the truth, should be entitled to the greater credit, as he is plainly under the strongest obligation." In most of the States of the Union, it has been held that the competency of a witness is not affected by a disbelief in a future state, and that his testimony should be admitted if he believes in the existence of a God and in divine punishment of crime. See *Hunscom* v. *Hunscom*, 15 *Mass.*, 184; *Brock* v. *Milligan*, 10 *Ohio*, 121; *Blocker* v. *Burness*, 2 *Ala.*, 354; *United States* v. *Kennedy*, 3 *McLean*, 175; *Bennett* v. *State*, 1 *Swan.*, 411. In our own State, the case of *Jones* v. *Harris*, 1 *Strob.*, 160, lays down very much the same doctrine, holding that a belief in God and his providence is sufficient to establish the competency of a witness, objected to on account of defective religious beliefs.

Now, let the competency of the witness, Jas. Miller, be tested

by the rule of *Jones* v. *Harris, supra,* which is the law of South Carolina on this subject. Did he believe in a God and his providence? He stated to the court that he had never heard of a God, or of a heaven, or of a hell, or of a devil. How, then, could he have a belief in the existence and providence of a Great Being, of whom, up to the time that he was offered as a witness, he had never heard even? Such a belief, under such circumstances, seems impossible. In the absence of such belief, he was incompetent under the authorities cited. The fact that he had learned the Lord's prayer, had repeated it daily for years, repeated it in court, and stated that he had heard it said that the bad man caught those who lied and cursed, &c., did not furnish, as it seems to us, sufficient proof of a belief on his part of the existence and providence of a Being of whom, up to that moment, he had never heard.

Next, as to the dying declarations. And, first, as to so much thereof as relates to the actual shooting of the deceased by the accused. The rule on the subject of dying declarations is so succinctly and clearly laid down by Mr. Greenleaf, that it is not necessary to do more than to quote from him. In section 138 he says: "It is the impression of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible. Therefore, where it appears that the deceased, at the time of the declaration, had any expectation or hope of recovery, however slight it may have been, and though death actually ensued in an hour afterwards, the declaration is inadmissible. On the other hand, a belief that he will not recover is not in itself sufficient, unless there be also the prospect of almost immediate dissolution."

Did the deceased have any, the least, expectation or hope of recovery at the time he made the declaration objected to? He had stated to his father, about 8 o'clock in the morning of the day on which he died, that he could not stand it much longer, send for the doctor quick, his exact language being: "Father, I can't stand it much longer; send for the doctor quick." If the declaration objected to had been made at this time, there would be much force in the argument of appellant's counsel, that he had not lost hope; else, why send for the doctor? But the declara-

tion was not made then ; it was made some two hours later, and after the doctor had arrived and probed the wounds and gone out. It was then about 10 a. m. that he was heard by Pace and Watts at separate moments to say, "O Lord, I can't stay here much longer," or "stand it much longer." These expressions, made without qualification or call for help from any source, seem to indicate an impression of hopeless impending death, with the prospect of immediate dissolution, which is in accordance with the rule laid down by Mr. Greenleaf above. The deceased died in the afternoon of the day during which these declarations were made. We think they were competent.

Next, as to the declaration of the deceased, that the accused had passed him upon the road. "When the death of the deceased is the subject of the charges, and the circumstances of the death are the subject of the dying declarations," they are admissible, says Mr. Greenleaf, section 156. In the case of *Terrell*, reported in 12 *Rich.*, 321, dying declarations extending to the previous conduct of the prisoner were held admissible. Under the authority of this case, we cannot say that the judge erred in admitting the testimony in question. They were made at the same time of the other declarations above, which we have held were competent as dying declarations ; and although they do not relate to the facts occurring immediately at the shooting, yet they state a circumstance pointing with more or less force to the prisoner as the party who committed the deed. This was regarded as sufficient in the *Terrell Case* to render them competent. In that case Judge O'Neall said : "The next inquiry is whether the circumstances stated by McCullam are properly in evidence. They are the circumstances which point out the prisoner who prepared the poison, and who made the party preparing the instrument of poisoning, the two Grahams and himself." The testimony falls within the rule, "When the death of the deceased is the subject of the charges, and the circumstances of the death are the subject of the dying declarations."

Lastly, as to the testimony of Kirkland, stating certain threats made by the accused against the Deans. The deceased was one of the family of the Deans. The accused did not limit his threats to any special member of that family, but said if those Deans did

not stay off his place and let him alone, he would put a load of shot into some of them, &c. The threats, in their terms, being general as to the Deans, and the deceased being one of the Deans, we cannot say it was error to admit them.

It is the judgment of this court, that the judgment below be reversed, on the ground of error in holding that the youth, James Miller, was a competent witness, and that the case be remanded for a new trial.

MR. JUSTICE McIVER concurred.

MR. JUSTICE McGOWAN. I incline to think that the colored lad, Jim Miller, was a competent witness under the ruling in *Jones* v. *Harris.* He was not educated in book, but he had at least ordinary intelligence, and was twelve years of age. Although he said he had never heard of "God," yet he could repeat the Lord's prayer, and had "a strong sense of the future torments by the bad man, awaiting them who speak falsely." Was not this really a belief in Providence and rewards and punishments? The tendency in these latter days is "to enlarge the circle of competency by directing objections to the credibility of witnesses."